UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| TALLAKOY LP, et al., | ) | |
|---|---|---|
| Plaintiffs, | ) | Civil No. 13-57-ART |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| BLACK FIRE ENERGY, Inc., et al., | ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

In this life, you make your own choices. The plaintiffs and the defendants executed a contract, requiring both parties to submit all disputes arising from the agreement to arbitration. After the relationship soured, the plaintiffs filed this lawsuit, alleging that the defendants breached the contract and defrauded them. Maybe so. But because the Court would have to refer to the agreement containing the arbitration clause to resolve each of the plaintiffs' claims, the Court must dismiss the case, and the parties must arbitrate their dispute.

## BACKGROUND

This case is about a very bad investment. The plaintiffs are Jason Bedasse, Garth Myers, and four investment companies that they own (Tallakoy LP, Tallakoy GP, Inc., Tallawah, Inc., and Akoya Group, Ltd., collectively, "Tallakoy"). R. 54 at ¶¶ 2–7. The defendants are Nicholas Stodin, Gill Brown, and two mining companies that they own (Black Fire Energy, Inc., and Black Fire Mining LLC, collectively, "Black Fire"). *Id.* at

¶¶ 8–11. While seeking out investment opportunities, Bedasse and Myers met Stodin. *Id.* at ¶¶ 15–16. Stodin told the plaintiffs that he was a successful businessman, that he had developed profitable ventures before, and that he had a mining operation that needed funding—the "Heller Mine." *Id.* at ¶¶ 16–17. Stodin sent Bedasse and Myers some promotional materials, and the plaintiffs were hooked. *Id.* at ¶¶ 18–20. Tallakoy then agreed to invest with Black Fire. *Id.* at ¶¶ 20–21.

The parties executed two contracts. Tallakoy LP and Black Fire Energy signed a Revenue Participation Agreement ("Revenue Agreement"), R. 1-2 at 7, and Tallakoy LP and Black Fire Mining signed a Security Pledge Agreement ("Security Agreement"), R. 54-4 at 3. The Revenue Agreement outlined the parties' obligations. R. 1-2. The Security Agreement gave Tallakoy LP a security interest in various equipment Black Fire owned. R. 54-4. Crucially, for the purposes of these motions, the Revenue Agreement included an arbitration clause. R. 1-2 at 5. The clause provides that: "Any dispute arising from this Agreement . . . shall be settled through binding arbitration." *Id.*

As with most business relationships that become the subject of litigation, things did not go as planned. Tallakoy sunk nearly $1,000,000 into the project, losing all of it. R. 54 at ¶¶ 29–31. Why such miserable failure? Because, Tallakoy says, Black Fire was perpetrating a fraud the whole time. The promotional materials were lies, the contract was full of lies, and once the contract was signed, Black Fire continued to lie. *Id.* at ¶¶ 18, 22, 29. Indeed, Tallakoy alleges that Black Fire took Tallakoy's investment and used the money for other projects, keeping all resulting profits for Black Fire. *Id.* at ¶¶ 35, 39.

Tallakoy filed suit in this Court. The complaint alleges several claims against each defendant: (1) securities fraud, (2) common law fraud, (3) breach of contract, (4) negligent misrepresentation, (5) conversion, and (6) unjust enrichment. R. 54 at 11–16.[1] Black Fire moved to dismiss in favor of arbitration, R. 45, and for failure to a state claim, R. 64.

## DISCUSSION

The Supreme Court has prescribed a two-step framework for analyzing motions to compel arbitration. Before ordering arbitration, the Court must decide whether: (1) the arbitration clause at issue is enforceable, and (2) the arbitration clause's scope encompasses the particular claim or claims that one party seeks to arbitrate. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2856 (2010).

This case does not involve a challenge to the validity or enforceability of the Revenue Agreement's arbitration clause. Although Tallakoy makes allegations of fraud, R. 54 at ¶¶ 46–51, Tallakoy does not contend that the fraud voids the arbitration clause specifically or the contract generally, *see* R. 66 at 5–6. *But see Granite Rock Co.*, 130 S. Ct. at 2858 (explaining that a court must enforce an arbitration clause according to its terms unless the party resisting arbitration specifically challenges the enforceability of the arbitration clause). Indeed, Tallakoy's breach of contract claim reflects its belief that the

---

[1] The complaint lists "demand for accounting" and "constructive trust" as independent claims, R. 54 at ¶¶ 67–73, but Tallakoy acknowledged at oral argument that those are remedies, not causes of action. Similarly, Count Nine alleges "civil conspiracy," R. 54 at ¶¶ 77–82, but civil conspiracy "is not a free-standing claim; rather it merely provides a theory under which a plaintiff may recover from multiple defendants for an underlying tort." *Flint v. Coach House, Inc.*, No. 2012-CA-000580-MR, 2013 WL 869649, at *4 (Ky. Ct. App. Mar. 8, 2013) (internal quotation marks omitted).

contract is enforceable. *See* R. 54 at ¶¶ 52–56. The only question presented, therefore, is which—if any—of Tallakoy's claims fall within the scope of the arbitration clause.

Where, as here, the parties have executed a valid arbitration agreement, the Federal Arbitration Act (the "Act") requires courts to resolve any ambiguities regarding the scope of the agreement in favor of arbitration. *Granite Rock Co.*, 130 S. Ct. at 2858. The Act provides that written agreements to arbitrate "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The Act was designed to fix two problems: "the old common law hostility toward arbitration, and the failure of state arbitration statutes to mandate enforcement of arbitration agreements." *Southland Corp. v. Keating*, 465 U.S. 1, 14 (1984). Section 2 responded to those problems by creating a vast body of substantive federal law: "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

So what is required for an arbitration agreement to fall within the scope of the Act? Not much. If the agreement to arbitrate is in writing and contained in "a contract evidencing a transaction involving commerce," then the Act applies. 9 U.S.C. § 2; *Keating*, 465 U.S. at 11. And where the Act applies, so too does the presumption in favor of arbitrability. *See Moses H. Cone*, 460 U.S. at 24–25.

This broad reading of § 2 has sweeping effect, preempting state law regarding arbitration. *See Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 451 (6th Cir. 2005) (citing

4

*Keating*, 465 U.S. at 10–11). The presumption in favor of arbitrability thus applies to every arbitration clause within the scope of the Act as a matter of federal law. *See, e.g.*, *NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 813 (6th Cir. 2008). Although it is easy to recite the presumption, explaining what the presumption requires can be tricky. In this Circuit, the key question is whether the Court "can resolve the instant case without reference to the agreement containing the arbitration clause." *Id.* at 814. "If such a reference is not necessary to the resolution of a particular claim, then compelled arbitration is inappropriate." *Id.* So the Court must analyze each of Tallakoy's claims to determine whether they require reference to the Revenue Agreement.[2]

## I. Tallakoy's Claims Require Reference to the Revenue Agreement

The problem for Tallakoy is that all of its claims incorporate allegations about the Revenue Agreement. *See, e.g.*, R. 54 at ¶ 41 ("The plaintiffs incorporate by reference the foregoing allegations in paragraphs 1 through 40 above as if set forth below in full."). Although Tallakoy's claims come in many shapes and sizes, they share two critical features: they refer to the agreement to establish (1) that Black Fire made false representations, *see id.* at ¶ 22 ("Through the Revenue Participation Agreement . . . the . . . defendants made the following false representations . . . ."), and (2) that Tallakoy relied on Black Fire's representations and therefore suffered damages, *see id.* at ¶ 23 ("In reliance on the representations in the Revenue Participation Agreement . . . [Tallakoy] agreed to

---

[2] Tallakoy argues that the Revenue Agreement's arbitration clause is narrow and suggests that a different analysis therefore controls. R. 66 at 5–6. *NCR Corp.*, however, contemplated that its analysis would apply to an agreement very much like this one. *See* 512 F.3d at 813 ("When faced with a broad arbitration clause, *such as one covering any dispute arising out of an agreement*, a court should follow the presumption of arbitration and resolve doubts in favor of arbitration.") (internal quotation marks omitted) (emphasis added). Therefore, *NCR Corp.*'s analytical framework applies here.

5

secure investment funds of $850,000 with [Black Fire] . . . in exchange for revenues generated from the sale of coal."). Because each of Tallakoy's claims refers to the Revenue Agreement, the parties must submit the entire dispute to arbitration. *See NCR Corp.*, 512 F.3d at 814.

Securities Fraud (Count I): Tallakoy cannot state a claim for securities fraud without referring to the agreement. The elements of securities fraud are: (1) a material misrepresentation or omission; (2) scienter; (3) connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 917 (6th Cir. 2007). To demonstrate "connection with the purchase or sale of a security," the complaint alleges that "[t]he investments the plaintiffs made with the defendants are securities." R. 54 at ¶ 43. Because Tallakoy made the investment pursuant to the Revenue Agreement, its securities fraud claim requires the Court to refer to the Agreement. Similarly, to establish reliance, economic loss, and causation, Tallakoy would have to point to the investment it made pursuant to the Revenue Agreement. *See id.* at ¶ 41 (incorporating Tallakoy's allegations about the Revenue Agreement into its securities fraud claim). Accordingly, Tallakoy's security fraud claim requires the Court to refer to the Revenue Agreement and must be submitted to arbitration.

Fraud (Count II): Tallakoy's common law fraud claim requires reference to the agreement to establish the existence of a materially false statement and reliance by Tallakoy. Under Kentucky law, a fraud claim requires proof of (1) a material representation, (2) which is false, (3) known to be false or made recklessly, (4) made with

6

inducement to be acted upon, (5) acted in reliance thereon, and (6) causing injury. *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999). Tallakoy's fraud claim is premised upon the "material misrepresentations of fact . . . set forth above," R. 54 at ¶ 47, and the claim incorporates all of the allegations regarding the falsity of the defendants' representations in the Revenue Agreement, *id.* at ¶ 46; *see id.* at ¶ 22 (listing the allegedly false representations in the Revenue Agreement).

Tallakoy also alleges that Black Fire made false statements not contained in the Revenue Agreement itself—such as lies in the promotional materials and misstatements regarding the progress of the project made after the contract was signed. *Id.* at ¶¶ 18, 29. But any fraud claim premised on those misstatements would still require the Court to refer to the Revenue Agreement—to establish reliance and injury. *See id.* at ¶ 46; *id.* at ¶ 23 (pleading reliance on the representations in the Revenue Agreement). Tallakoy's alleged reliance on the misstatements in the promotional materials came in the form of its initial investment with Black Fire, which was made pursuant to the Revenue Agreement. *See id.* at ¶ 23. And Tallakoy relied on Black Fire's subsequent misrepresentations by making an additional investment, which was executed as an amendment to the Revenue Agreement. *See id.* at ¶ 30. The amendment did not displace the arbitration clause. *See id.* So Tallakoy cannot establish reliance or injury regarding *any* of the alleged misrepresentations without referring to the Agreement, and this claim must be arbitrated.

<u>Breach of Contract (Count III)</u>: Tallakoy concedes that Tallakoy LP—the signatory of the Revenue Agreement—must arbitrate its breach of contract claim. R. 66 at 3. But, for the reasons explained in Section II, each of the plaintiffs is bound by the

arbitration clause, so they are all required to arbitrate their breach of contract claims, which require them to refer to Black Fire's obligations under the Revenue Agreement. *See* R. 54 at ¶¶ 52, 53.

Negligent Misrepresentation (Count IV): Tallakoy's negligent misrepresentation claim is premised upon false statements in the Revenue Agreement and Tallakoy's supposed reliance on those statements. A defendant commits the tort of negligent misrepresentation if, in the course of any transaction "in which he has a pecuniary interest," he "supplies false information for the guidance of others in their business transactions." *See Presnell Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 580–82 (Ky. 2004) (describing the tort and adopting it into Kentucky law). If the plaintiff justifiably relied on the misrepresentations, then he may recover. *Id.* Tallakoy's negligent misrepresentation claim incorporates all of the complaint's allegations regarding the false statements in the Revenue Agreement. R. 54 at ¶ 57. So the Court would have to refer to the Revenue Agreement to ascertain what "false information" Black Fire supplied to Tallakoy. And to prove reliance, Tallakoy would have to show that it justifiably relied upon the false information and suffered pecuniary loss. Of course, Tallakoy relied on the statements by investing with Black Fire, and that investment was made pursuant to the Revenue Agreement. *See* R. 54 at ¶ 23.

Conversion (Count V): Tallakoy's conversion claim similarly requires reference to the Revenue Agreement. The elements of conversion are "(1) ownership rights in a certain property, (2) the wrongful act of taking or disposing of property, and (3) causing damages." *Davis v. Siemens Med. Solutions USA, Inc.*, 399 F. Supp. 2d 785, 801 (W.D.

Ky. 2005) (citing *Goss v. Bisset*, 411 S.W.2d 50, 53 (Ky. 1967)). Tallakoy's conversion claim alleges that Black Fire wrongfully took its investment by failing to use the money for the purposes promised in the Revenue Agreement: "the defendants have converted the funds the plaintiffs invested to their own personal benefit [] by transferring the funds to other operations, *rather than use the funds as they promised.*" R. 54 at ¶ 62 (emphasis added). Tallakoy thus relies on the promises in the Revenue Agreement to establish the wrongfulness of the taking, so this claim too falls within the scope of the arbitration clause.

<u>Unjust Enrichment (Count VIII)</u>: Finally, Tallakoy's unjust enrichment claim also necessarily refers to the Revenue Agreement. Under Kentucky law, the elements of unjust enrichment are: "(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009). Tallakoy alleges that Black Fire was "unjustly enriched by the plaintiffs' *investment*." R. 54 at ¶ 75. So, to establish that Tallakoy conferred a benefit on Black Fire, Tallakoy must refer to its investment, which it made pursuant to the Revenue Agreement. *See id.* at ¶ 23. The unjust enrichment claim therefore cannot be resolved without reference to the Agreement, and the parties must arbitrate it too.

## II. Black Fire May Enforce the Arbitration Clause Against Tallakoy

Tallakoy marshals two arguments against this straightforward application of the Federal Arbitration Act to its complaint: (1) that Black Fire waived its right to invoke the arbitration clause, R. 67 at 11–12, and (2) that only the signatory of the Revenue

Agreement, Tallakoy LP, is bound by the arbitration clause. R. 66 at 7.[3]

Waiver: Tallakoy says Black Fire waived its right to invoke the arbitration clause by filing a motion to dismiss. R. 67 at 11–12. A party may waive its right to compel arbitration by either "(1) taking actions that are completely inconsistent with any reliance on an arbitration agreement; [or] (2) delaying its assertion to such an extent that the opposing party incurs actual prejudice." *Johnson Assocs. Corp. v. HL Operating Corp.*, 680 F.3d 713, 717 (6th Cir. 2012) (internal quotation marks omitted). Black Fire did neither. Unlike the defendant in *Johnson*, Black Fire raised the obligation to arbitrate in its answer, R. 63 at ¶ 15, and promptly moved to dismiss in favor of arbitration, R. 45. *See Johnson*, 680 F.3d at 717–19 (distinguishing cases finding no waiver because "in those cases, unlike here, the right to arbitration was raised in each of the defendants' respective answers"). Tallakoy cites no authority for the proposition that filing an alternative motion to dismiss—without more—constitutes a waiver of the right to arbitrate. Because Black Fire raised the obligation to arbitrate in its answer, promptly moved to dismiss in favor of arbitration, and took no action inconsistent with its desire to arbitrate the dispute, Tallakoy's waiver argument fails. *See id.*

Application of the arbitration clause to non-parties: Tallakoy correctly notes that only Black Fire Energy, Inc., and Tallakoy LP signed the Revenue Agreement. R. 1-2 at 7. Therefore, Tallakoy contends, only those parties are bound to arbitrate their claims. R. 66 at 7. Usually, only parties to a contract are bound by the contract's terms, but courts

---

[3] Tallakoy also suggested at oral argument that it could show reliance and damages by pointing to the investment itself, rather than the contract, as the money was transferred before the contract was signed. But the Revenue Agreement specifically referred to the payments, R. 1-2 at 1, and Tallakoy alleges that it made its investment in reliance on the representations in the Revenue Agreement, R. 54 at ¶ 23.

have erected an array of equitable doctrines to prevent parties from claiming benefits under a contract while disclaiming the contract's arbitration clause. *See Javitch v. First Union Secs., Inc.*, 315 F.3d 619, 629 (6th Cir. 2003) ("Five theories for binding nonsignatories to arbitration agreements have been recognized . . . ."). One of those doctrines, equitable estoppel, squarely applies to this case. In the arbitration context, equitable estoppel forbids a party from "claim[ing] the benefit of the contract and simultaneously avoid[ing] its burdens." *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000) (internal quotation marks omitted). And that is precisely what the plaintiffs are trying to do by asserting breach of contract claims against the defendants: they each seek to enforce the contract without being bound by its arbitration clause. *See* R. 54 at ¶¶ 52–56. But equitable estoppel prevents a party from "asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the contract should be enforced to benefit him." *Int'l Paper Co.*, 206 F.3d at 418. Thus, the plaintiffs may not insist that they are entitled to payment under the contract without being bound by its obligation to arbitrate. *See Javitch*, 315 F.3d at 629; *Int'l Paper*, 206 F.3d at 418.

## CONCLUSION

Tallakoy agreed to an arbitration clause embracing "[a]ny dispute arising from this Agreement." R. 1-2 at 5. Tallakoy now seeks judicial resolution of claims that are closely tied to the agreement containing the arbitration clause. The Revenue Agreement requires the parties to arbitrate Tallakoy's claims, and the FAA requires this Court to

enforce the Agreement.

Accordingly, it is **ORDERED** that:

(1)   The defendants' motion to dismiss in favor of arbitration, R. 45, is **GRANTED**.

(2)   The defendants' motion to dismiss for failure to state a claim, R. 64, is **DENIED WITHOUT PREJUDICE**, for lack of subject matter jurisdiction.

(3)   The defendants' motion to strike, R. 69, is **DENIED** as moot.

This the 29th day of October, 2013.

Signed By:
*Amul R. Thapar* AT
United States District Judge